UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

NOEL THOMAS PATTON, et al.,          :

                         Plaintiffs,     :

                                    :          12 Civ. 2500 (LGS)

               -against-          :

                                      :          <u>OPINION AND ORDER</u>

BRIAN EGAN, et al.,          :

                       Defendants.  :

------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

    Defendant and Counterclaimant, Brian Egan, was fired from his employment with Plaintiff TA Sciences Inc. ("TAS") on September 15, 2011. This dispute arises out of that termination. Plaintiffs Asia Biotech Corp., TAS, and Noel Patton initiated this lawsuit in New York County Supreme Court, alleging that Egan breached the parties' Confidential Disclosure Agreement (the "CDA"), defamed Plaintiffs, and tortiously interfered with their prospective business advantage. Egan asserts counterclaims against Plaintiffs and third-party claims against Weiman Liu, an employee of TAS. The counterclaims allege that Plaintiffs -- Patton, TAS and Asia Biotech -- violated the New York State Human Rights Law and the New York City Human Rights Law, and that Plaintiffs and Weiman Liu defamed Egan. The case was removed to federal court based on diversity jurisdiction.

    Plaintiffs and Third Party Defendant Liu move for partial summary judgment on Egan's defamation claim and seek to limit Egan's damages for his discrimination claims. Egan moves for summary judgment on all of Plaintiffs' claims. For the reasons stated below, Egan's motion for summary judgment is granted in part and denied in part. Liu and Plaintiffs' motion for partial summary judgment is granted in part and denied in part.

**BACKGROUND**

**A. Timeline**

Plaintiff Patton has been the Chairman of TAS since 2002.  From October 2007 to January 2012, Liu was the Vice President of Operations for TAS.  TAS arranges for the manufacture of and distributes in the United States a dietary supplement called TA 65.  On May 16, 2011, Egan began employment with TAS as Vice President of Global Business Development, primarily tasked with increasing international sales.

At that time, he signed the CDA with TAS and Asia Biotech, an affiliate of TAS, of which Mr. Patton was also chairman.  The nondisclosure agreement stated, in relevant part:

> The Recipient [Egan] desires, as part of its evaluation . . . concerning the possible rendering of services . . . to become familiarized with . . . certain information regarding the business and potential business of the Disclosing Party [Asia Biotech Corp. and TA Sciences Inc.], and [i]n consideration of [this] premise . . . the parties hereto do hereby agree [to the CDA]. . . .

> "Confidential Information" shall mean any and all data and information furnished by the Disclosing Party or its representatives to the Recipient or its representatives including, but not limited to:

> (iii) Any information relating to the actual or potential . . . customers, suppliers, . . . research, . . . or marketing of the Disclosing Party. . . .

> Confidential Information shall not include any data or information that:

> . . . (ii) has been independently developed and disclosed by parties other than the parties hereto . . . to the Recipient without a breach by any such parties of any obligation of confidentiality running directly or indirectly to the Disclosing Party.

> . . . Within twenty (20) days following the receipt of a written request from the Disclosing  Party, the Recipient will deliver to the Disclosing  Party  all tangible materials containing or embodying the Proprietary Information [defined earlier in the contract as Trade Secrets and Confidential Information] received by it from the Disclosing Party, including all copies thereof. . . .

On September 15, 2011, after four months of employment, TAS fired Egan.  The parties present conflicting versions of Egan's termination.

According to Egan, on September 13, 2011, he was diagnosed with prostate cancer. Egan's physician told Egan, who had been taking TA 65, to stop taking it immediately.  Egan called Patton and informed him of the diagnosis.  According to Egan, Patton responded angrily and informed him that he could not work at TAS anymore, as a cancer scare could hurt the company.  According to Egan, on September 15, Patton came to Egan's office, alone, and fired him because he had cancer.

Patton and TAS claim that Egan was fired for performance reasons and that Patton was unaware at the time that Egan had cancer.  According to Plaintiffs, on September 14, 2011, Patton determined that Egan did not understand the company's business, had achieved no sales and was not meeting Patton's expectations.  Patton and Liu together went to Egan's office at around 4:30 p.m. on September 15, 2011.  Patton informed Egan that he was being fired for performance reasons.  According to Patton and Liu, Egan argued with Patton about his termination, cursed angrily at Patton, pushed the heavy glass tabletop at him, hit Patton's hand, and challenged Patton to fight.  Egan then packed his bag, allegedly saying "You haven't heard the last of me."

Patton and Liu claim that when Egan left the office, he grabbed a piece of paper that contained the names of potential customers or people that Egan had developed with Dr. Javier Moran.  Moran was a potential TAS business associate, whom Egan had met in June 2011 at a conference in Belgium shortly after Egan began his employment with TAS.  Plaintiffs assert that they demanded that Egan return the document, but he failed to do so.  Egan denies that he took any documents when he was terminated, and states that the document with potential customer

names was an email from Moran, which Plaintiffs continued to possess after Egan's termination and which they produced to Egan in discovery.

After he was terminated by TAS, Egan did not seek any employment between September 15 and December 31, 2011. Beginning in January 2012, Egan became employed by Corporate Trade Inc. Media Services, a company that he owned, and did not seek outside employment.

## B. Allegedly Defamatory Emails

Egan sent an email to two coworkers at TAS, Dean Miller and Marty Chio, on September 15, 2011, the day he was terminated, which states:

> . . . I never realized just how much of a first class scumbag this guy is, plain and simple. From his infidelities, to his discriminatory actions against me today.  I hope you and Marty leave this scumbag, you can do much better than working for this 'clown'.

> Yesterday I advised Noel that i just found out tuesday from my urologist that I have prostate cancer. My doctor advised me to immediately stop taking TA 65.

> He 'freaked out' telling me I had to keep this confidential from TA Sciences employees and customers, and was very concerned about the fact I am taking TA 65, and any association between my cancer and TA 65. He said a 'cancer scare' could close the company.

> The piece of shit had no concern whatsoever for my health just any negatives for TA 65. I am convinced there is a connection, and he knows there is a connection based on his comments and actions. Plus the comments he made to us previously about closing the business if patients got cancer.

> Today at 4:30 pm he meet with me and advised me he had to sever any business relationship with me because of my cancer, and offered me $50,000 if I would sign a confidentiality agreement about this matter.

> I refused and advised him I would be speaking with a lawyer, because I do think there is a connection. . . .

On September 16, 2011, Patton and Liu each sent an email to the employees of TAS, as well as Edwin Dean and Joe Ferreira regarding the events of the previous day.  Dean acted as a

recruiter for TAS and introduced Egan to the company.  Ferreira is a 2% owner of TAS and

interviewed Egan before he was hired.  Patton's email includes the following:

> . . . Upon hearing that he was fired, Brian became very abusive, threatening and
> actually physically assaulted me.
>
> I have already informed the police about Brian's actions and hopefully they will
> take the necessary steps to protect me and the company from any further damage.
>
> I think everyone would be well advised to have no contact with Brian unless a
> lawyer or law enforcement officer is present.

Liu's email states in relevant part:

> . . . I was shocked and scared to see Brian's reaction. He was shouting and cursing
> using F words almost in every sentence. I was afraid the situation might be escalated
> and tried to calm him down a few times. Towards the end, he stood up and hit/push
> the glass table really hard. Either his fist or the table touched Noel's hand or arm.
>
> -        As he was packing his bag, Brian threatened to get even. My interpretation
> of his threats was that Brian won't let the matter go and would take action.
>
> During the entire meeting, I didn't hear any thing about cancer and about
> $50,000! . . .

On September 19, 2011, Egan sent an email to Moran, which states:

> Javier, I can't come to Madrid or to Paris now, since I was diagnosed with prostate
> cancer. I think it was caused by taking TA 65. When I disclosed this to the owner
> of the company, he fired me saying a "cancer scare" related to TA 65 could
> bankrupt the company etc, and they could have no connection to me.
>
> Noel Patton is not what you and I would call an honest caring person. I wanted to
> speak with you to protect your interests.

On September 21, 2011, Moran forwarded this email to Patton with the following message:

> Dear Noel, I am a professional and never enter in the policy of the companies.
> However I think that you must know, in a confidential way, please, the ideas of
> Brian: [the content of Egan's September 19 email]. Of course, I do not contact again
> with Brian.
>
> I think that will be interesting if we can have a meeting in Madrid because I can
> explain you my work and the possibilities to cooperate. The idea of Brian is that I
> am a person to open doors with my clients and it is correct but I work in other tasks

also important and not related to commercial activities. I have contacted Brian with a lot of clients with possible interest in your products and I receive promises from him regarding percentage of the sales but my Consulting work not only for finder fees. . . . I will be in Madrid on Friday October 7th and if you like we can meet that day. Please tell me the time more convenient for you and what will be your hotel and I can come there.

On September 26, 2011, Egan sent an email to Joe Ferreira, attaching a letter dated September 23, 2011, from the Lurie Law Firm LLC to Edwin Dean, which includes the following:

. . . Mr. Egan spoke with Patton by telephone, and advised him of his [prostate cancer] diagnosis. Patton angrily responded that Mr. Egan could not be affiliated with [TAS] because, if knowledge of Mr. Egan's cancer became public, this could put the company out of business. On the next day, September 15.2011, Patton personally came to Mr. Egan's office. Patton reiterated that he could not afford to have the public know that one of its employees, who had religiously taken TA-65 had developed cancer and that Mr. Egan's doctor had noted that this product could have further negative impact on the progression of the disease. Patton [concluded] by terminating Mr. Egan effective immediately.

Patton testified that Moran failed to appear for a meeting in Madrid they had scheduled for October 7, 2011. Patton does not know why Moran stood him up but felt it was because of Egan, as Patton does not usually get stood up for business meetings. Moran gave Patton an unintelligible excuse when he asked Moran why he had missed the meeting.

On March 24, 2012, Moran sent another email to Patton and forwarded a March 22, 2012, email he had received from Egan. In the email, Moran said to Patton:

Dear Noel, I am sending you a copy of the mail received from Brian. Really I do not like be involved in your wars because I have introduced your company within my clients and I do not obtain anything from you. I cannot understand why you can use me if you never have accepted sign a contract with my consulting!.
Regards, Javier.

The attached email from Egan to Moran stated, "I am up against a very unethical man . . . .  As you know, Noel [Patton] rejected the compensation plan you submitted to me . . . .  He wanted to get your valuable business contacts for free, and circumvent paying you."

Patton testified that he gave up trying to get business from Moran after Moran sent him the March 24, 2012 email.

**STANDARD**

The standard for summary judgment is well established.  Summary judgment is appropriate where the record before the court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor.  *See id*. at 255.

A federal court sitting in diversity applies the choice of law rules of the forum state.  *See In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Thus, New York choice of law principles apply here.  First, concerning claims arising under the parties' CDA, New York law gives full effect to any choice of law provisions that parties incorporate into contracts.  *See Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987) (citing *A.S. Rampell, Inc. v. Hyster Co.*, 144 N.E.2d 371, 379 (N.Y. 1957)).  Here, as the CDA contains a New York choice of law provision, New York law applies to any claims arising under the CDA.  Second, turning to claims that do not arise under the CDA, "[u]nder New York's interest analysis approach[,] courts seek to effect the law of the

jurisdiction having the greatest interest in resolving the particular issue, which in the typical case will be either the jurisdiction where the tort occurred or the domicile of one or more of the parties." *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 12 N.E.3d 456, 462 (N.Y. 2014) (internal quotation marks and citations omitted). Here, as the events that gave rise to the lawsuit appear to have occurred primarily in New York, New York law also applies to claims outside the purview of the CDA.

## **DISCUSSION**

### I.     **Plaintiff's Breach of Contract Claim**

Defendant Egan moves for summary judgment on Plaintiffs' breach of contract claim. Plaintiffs oppose, arguing Egan took information that belonged to the company and violated the terms of the parties' CDA. Assuming for purposes of the motion that Egan did take such information and failed to return it upon demand, the information in any event is not "Confidential Information" as defined in the CDA. Therefore, Egan did not breach the CDA with respect to that information, and the motion is granted.

Whether contract provisions are ambiguous is a question of law. *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 89 n.9 (2d Cir. 2013). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). "If the relevant provisions are unambiguous, courts interpret and apply those provisions as a matter of law." *Ali*, 719 F.3d at 89 n.9. Courts must interpret the contract to "effectuate its plain language." *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002).

The CDA defines "Confidential Information" as "any and all data and information furnished by the Disclosing Party [referring to Asia Biotech Corp. and TAS] or its

representatives to the Recipient [referring to Brian Egan] or its representatives . . . ." Information that was "independently developed and disclosed by parties other than the parties hereto . . . to the Recipient without a breach by any such parties of any obligation of confidentiality running directly or indirectly to the Disclosing Party. . ." is not confidential under the terms of the agreement.  If requested, Egan, the receiving party, was required to return information "received by [Egan] from the Disclosing Party."

The plain meaning of the CDA is that it created obligations only with respect to information furnished by Plaintiffs.  Plaintiffs point to no evidence from which a reasonable jury could conclude that the document containing the names of potential customers was "furnished" to Egan by the Plaintiffs.  Plaintiffs argue that Egan's obtaining the information while in the employ of Plaintiffs brings the information within the definition of Confidential Information. That argument is undermined by the unambiguous language of the CDA expressly excluding information that was "independently developed and disclosed by parties other than the parties hereto."  There is no dispute that Moran developed the potential customer list at issue and disclosed it to Egan.  Consequently, it is not covered by the terms of the CDA.

Plaintiffs argue that information obtained during the course of employment is routinely recognized as confidential.  However, the CDA and its definition of "Confidential Information" govern Plaintiffs' breach of contract claim.  That definition does not include information obtained from third parties during the course of Egan's employment.  Plaintiffs could have included this concept in the definition, but did not do so.  *See Vt. Teddy Bear  Co., Inc. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 880 (N.Y. 2004) (finding no intent to add terms where sophisticated parties could have added a term, but failed to do so).  Accordingly, Egan's motion for summary judgment on Plaintiffs' breach of contract claim is granted.

## II.     Plaintiffs' Libel Claims

The Complaint asserts libel based on Egan's 2011 emails of September 15 (to Miller and Chio), 19 (to Moran) and 26 (to Ferreira, attaching a September 23 letter).  Egan moves for summary judgment.  Plaintiffs oppose and argue that Egan's emails constitute libel per se. Because the statements are libel per se as a matter of law and mixed expressions of opinion and fact, Egan's motion is denied.

Libel is the written form of defamation, "the invasion of the interest in a reputation and good name." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 84 A.D.2d 470, 474 (N.Y. App. Div. 1982).  The elements of libel under New York law are (i) a written, false statement of fact about the plaintiff, (ii) published to a third party without privilege or authorization, (iii) with fault of at least negligence, and (iv) that caused special harm or was libel per se.  *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003) (stating elements of defamation) (citing *Dillon v. City of New York*, 261 A.D.2d 34, 38 (N.Y. App. Div. 1999)); *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (explaining that libel is a written form of defamation and listing elements of libel).

Libel per se is libel for which damages are presumed.  *Schindler v. Mejias*, 100 A.D.3d 1315, 1316 (N.Y. App. Div. 2012).  The types of statements for which damages are presumed include those that "charge a person with committing a serious crime" or "tend to cause injury to a person's profession or business."  *Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010). "Whether particular statements are considered [libel] per se is a question of law."  *Id.*

Expressions of pure opinion are not actionable under the New York Constitution. *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1280 (N.Y. 1991).  Whether a statement is a fact or opinion also is a question of law for the court.  *Celle*, 209 F.3d at 178 (citing *Rinaldi v. Holt, Rinehart & Winston*, 366 N.E.2d 1299, 1306 (N.Y. 1977)).

10

Plaintiffs allege that Egan's emails accuse Patton and TAS of the crime of bribery, because Egan wrote that Patton "offered him $50,000" if he would sign a confidentiality agreement regarding the circumstances of his termination.  False allegations of bribery are defamatory per se.  *Liberman v. Gelstein*, 605 N.E.2d 344, 347-48 (N.Y. 1992).  In general, bribery is "[t]he corrupt payment, receipt, or solicitation of *a private favor for official action*. . . . and is a felony in most jurisdictions."  Black's Law Dictionary (9th ed. 2009) (emphasis added).  New York Penal Law prohibits bribery aimed at (1) influencing employees' conduct in their employers' affairs without their employer's consent, N.Y. Penal Law §§ 180.00-180.08 (McKinney 2014); (2) labor officials, *id.* at §§ 180.15-180.30; (3) sports contests, *id.* at §§ 180.35-180.53; (4) rent gouging, *id.* at §§ 180.54-180.57; and (5) public officials, *id.* at § 200.00 *et seq.*

Patton's alleged offer does not fit within any of the definitions of bribery, generally or under New York law.  Plaintiffs have not cited to any official duty that Egan had to disclose the circumstances of his termination; nor have they cited any applicable bribery statute that would prohibit Patton's alleged offer.  Confidentiality agreements between employer and employee regarding termination are not uncommon.  An offer of consideration for such an agreement does not in these circumstances constitute bribery.  Consequently, Egan's publicly disclosing that Patton made such an offer is not a charge of bribery that would make the disclosure libel per se.

In addition to a false statement about a serious crime, libel per se may be based on a false statement that tends to cause injury to a person's profession or business.  For a statement in the latter category to constitute libel per se, "the challenged statement must be more than a general reflection upon [the plaintiff]'s character or qualities[;]" rather the "statement must reflect on [the plaintiff's] performance or be incompatible with the proper conduct of [the plaintiff's]

business." *Zetes v. Stephens*, 108 A.D.3d 1014, 1019 (N.Y. App. Div. 2013) (quoting *Golub v. Enquirer/Star Grp., Inc.*, 681 N.E.2d 1282, 1283 (N.Y. 1997), and dismissing claim of slander per se).

Plaintiffs argue that the three emails at issue contain two types of statements that constitute libel per se: (1) accusing Patton and TAS of firing Egan for an improper and discriminatory reason, i.e., that he had cancer; and (2) stating to Moran, a potential business collaborator, that Patton is not "an honest caring person." Defendant Egan argues that these statements merely disparaged Patton's character and, in any case, constitute non-actionable opinion. Egan's arguments are unpersuasive.

The challenged statements do not merely comment on Patton's general character; rather, they could be reasonably understood to malign Patton's honesty and integrity as a businessman. *See Four Star Stage Lighting v. Merrick*, 56 A.D.2d 767, 768 (N.Y. App. Div. 1977) (holding that statements that plaintiffs were leasing equipment that they did not own were actionable, as the statements implied plaintiffs were "not entirely honest" in their business). These statements, therefore, are "reasonably susceptible of a defamatory meaning" concerning Patton's profession. *Gjonlekaj v. Sot*, 308 A.D.2d 471, 473 (N.Y. App. Div. 2003).

Although the challenged statements express opinions, they also "reasonably appear to . . . imply assertions of objective fact" and are therefore actionable. *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1273 (N.Y. 1991) (holding that statements that express opinions while stating or implying objective facts are actionable); *see also Rossi v. Attanasio*, 48 A.D.3d 1025, 1027-28 (N.Y. App. Div. 2008) (holding that mixed statements of opinion and fact are actionable if they are implicitly "based upon certain facts known to the speaker that are undisclosed to the listener"). Standing alone, Defendant's statement that Patton is not "an honest

caring person" may be opinion, but the statement must be construed in the context of the entire communication.  *See id.*  In his email to Moran, Egan also wrote, "When I disclosed this to the owner of the company, he fired me saying a 'cancer scare' related to TA 65 could bankrupt the company etc, and they could have no connection to me. . . .  I wanted to speak with you to protect your interests."  The overall communication, then, reasonably could be read to be "based upon certain facts known to the speaker that are undisclosed to the listener."  *Rossi*, 48 A.D.3d at 1027-28.  The challenged statements, therefore, are actionable as mixed statements of opinion and fact.

Accordingly, Egan's motion for summary judgment on Plaintiffs' libel claims is denied.

## III.   Plaintiffs' Claim for Tortious Interference with Prospective Business Relationships

Egan moves for summary judgment on Plaintiffs' tortious interference claim.

Because there are questions of material fact from which a jury could conclude that Egan intentionally interfered with the prospective business relationship between TAS and Moran, the motion is denied.

The elements of a claim for tortious interference with a prospective business relationship, are: "(l) the defendant's knowledge of a business relationship between the plaintiff and a third party; (2) the defendant's intentional interference with the relationship; (3) that the defendant acted by the use of wrongful means or with the sole purpose of malice; and (4) resulting injury to the business relationship."  *534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick*, 90 A.D.3d 541, 542 (N.Y. App. Div. 2011); *accord Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  The third element is met where the defendant "violated the law," the defendant's actions were "independently tortious," *Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 108 (N.Y. App. Div. 2009), or "the defendant . . . acted for the sole purpose of

inflicting intentional harm on [the] plaintiff[]." *Posner v. Lewis*, 965 N.E.2d 949, 952 n.2 (N.Y. 2012) (internal quotation marks and citation omitted).

Egan does not dispute that he had knowledge of at least a prospective business relationship between Plaintiffs and Moran.  Plaintiffs have raised triable issues of facts as to second and third elements -- whether Egan intentionally interfered with the relationship and acted for the sole purpose of inflicting harm.

Egan sent the September 19 email to Moran, which provides, in relevant part, "When I disclosed [my prostate cancer] to the owner of the company, he fired me saying a 'cancer scare' related to TA 65 could bankrupt the company etc, [sic] and they could have no connection with me.  Noel Patton is not what you and I would call an honest [sic] caring person.  I wanted to speak with you to protect your interests."  Plaintiffs argue that, as a result of this email, the relationship between Moran and TAS deteriorated, and Moran skipped a business meeting with Plaintiffs.

Resolving all factual disputes in Plaintiffs' favor and viewing the facts in the light most favorable to the Plaintiffs, a reasonable jury could find that: (1) Egan was discharged for a lack of adequate performance; (2) he desired retribution as a result of his termination; (3) he fabricated a false version of the termination meeting with Patton, which he then conveyed to Moran in his September 19 email; (4) he sent the September 19 email for the sole purpose of inflicting intentional harm; and (5) as a result of Egan's email, Moran no longer wanted to conduct business with Plaintiffs.  *Cf. Freedman v. Pearlman*, 271 A.D.2d 301, 303 (N.Y. App. Div. 2000) (holding that the plaintiff's claim of tortious interference with business relations survives dismissal because "[the plaintiff] alleged that [the defendant] informed [plaintiff's prospective employer], which had extended a  job offer to [the plaintiff], that [the plaintiff] had

been acting 'crazy, that [he] was litigious and questioned whether anyone would want to work with [him],' resulting in the revocation of the offer").

Egan argues that because Moran wrote an email back to Plaintiffs, indicating that he was not dissuaded by Egan's email, Plaintiffs cannot show any economic harm from Egan's alleged interference. Plaintiffs point to the fact that Moran did not appear for a scheduled business meeting. Viewing the facts in the light most favorable to the nonmoving party, here the Plaintiffs, Moran's failure to attend the meeting might be sufficient for a reasonable jury to conclude that Egan poisoned Moran's relationship with Plaintiffs. Egan also argues that, as evidenced by his email, he was not acting with the sole purpose of inflicting harm on Plaintiffs but was also seeking to protect "Moran's interest." A reasonable jury, however, could conclude that Egan was disingenuous when he wrote that email, and that given the timing of the email, Egan was acting for the sole purpose of inflicting harm on Plaintiffs.

For all of these reasons, Egan's motion for summary judgment on Plaintiffs' tortious interference claim is denied.

## IV.    Defendant's Defamation Counterclaim

Plaintiffs and Third-Party Defendant Weiman Liu move for summary judgment on Egan's counterclaim for defamation against Plaintiffs and Liu, based on allegedly false statements made to Egan's co-workers. Egan's claim is based on Patton and Liu's statements to TAS employees that Egan physically assaulted Patton and lied to his employer about having cancer. Plaintiffs and Liu argue, first, that the statements are not libel per se as they merely indicate that Egan had not met his employer's expectations; and second, that the challenged statements, as communications to the employees of a small company, are protected by a qualified "common interest" privilege. The motion for summary judgment on Egan's counterclaim is

denied.  Although the statements constitute libel per se, a question of fact remains for the jury as to whether any privilege is overcome by Patton and Liu's wrongful state of mind when the statements were made.

First, as discussed above, an element of libel is that the statement caused special harm or was libel per se.  Egan does not argue that he suffered any special damages.  Instead, he argues that Patton and Liu's statements constitute libel per se because they "tend to cause injury to a person's profession or business," *Geraci*, 938 N.E.2d at 922.  The alleged statements that Egan is violent in the workplace and lied to his employer about a serious health condition, if true, would tend to injure Egan in his business, and therefore are libel per se.

Second, an additional element of libel is that the statements were published to a third party without privilege or authorization.  Plaintiffs and Liu argue that the challenged statements are protected by a "common interest" privilege.  New York courts have recognized a qualified privilege that "extends to a communication made by one person to another upon a subject which both have an interest."  *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992) (citation and internal quotation marks omitted).  The "common interest" privilege has been applied to statements made among employees "in furtherance of the common interest of the employer." *Loughry v. Lincoln First Bank, N.A.*, 494 N.E.2d 70, 73 (N.Y. 1986).  The existence of privilege is a question of law.  *O'Neil v. Peekskill Faculty Ass'n*, 120 A.D.2d 36, 42 (N.Y. App. Div. 1986).

As colleagues at a small organization, Patton and Liu conceivably shared a reasonable common interest in emailing the challenged statements to other employees, and Egan does not contest that such a common interest existed.

The common interest privilege, however, does not "shelter statements published with malice or with knowledge of their falsity or reckless disregard as to their truth or falsity." *Loughry*, 494 N.E.2d at 73.  Malice exists where "the motivation for making such statements was spite or ill will (common-law malice) or where the statements were made with a high degree of awareness of their probable falsity (constitutional malice)."  *Foster v. Churchill*, 665 N.E.2d 153, 157 (N.Y. 1996) (citing *Liberman*, 605 N.E.2d at 350) (internal quotation marks and alterations omitted).  These issues are questions of fact for the jury.  *See Stukuls v. State*, 366 N.E.2d 829, 834 (N.Y. 1977).  "[A] triable issue is raised only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'"  *Liberman*, 605 N.E.2d at 350 (quoting *Stukuls*, 366 N.E.2d at 835).

Genuine issues of material fact exist concerning Patton and Liu's state of mind -- that is, whether they published the statements with malice, knowledge of their falsity, or reckless disregard as to their truth.  A reasonable jury could conclude, based upon the coordinated nature of Patton and Liu's emails and the evident animus among the parties, that the motivation for sending the emails to the staff was malice and that the statements were made with a high degree of awareness of their probable falsity.  Accordingly, Liu and Plaintiffs' motion for summary judgment on Egan's libel claims is denied.

## V.     Limitations on Counterclaim Damages

Plaintiffs seek to limit Egan's counterclaim damages for five separate reasons.  Whether construed as summary judgment motions, which ordinarily are confined to claims and not issues,

or as a motions in limine,[1]  Plaintiffs' damages motions are granted in part and denied in part as follows.

First, Plaintiffs argue that Egan is not entitled to damages resulting from his allegedly contracting cancer from TA 65, including damages for emotional distress.  Egan agrees that he will seek damages that arise only from his employment discrimination and defamation claims, including emotional distress damages arising from his termination.  The motion is unopposed and therefore granted on this limited issue.

Second, Plaintiffs argue that Egan is not entitled to back-pay damages resulting from his termination because Egan testified that (1) he would have resigned when he formed the belief that TA 65 was dangerous and (2) he would have been too emotionally distressed to work for three months at the end of 2011.  Egan's testimony that he would have quit, however, was hypothetical and he later contradicted himself.  A reasonable jury could find that Egan would have continued working had he not been terminated, and that he would have been physically able to continue work, despite any emotional distress.  A jury could conclude, therefore, that Egan is entitled to back pay.  The motion to limit damages on the issue of back pay is denied.

Third, Plaintiffs argue that Egan failed to mitigate damages after he was terminated. Parties seeking damages in discrimination cases have a duty to mitigate their damages.  *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982).  Mitigation, however, is a question of fact for

---

[1] *Compare In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007) (construing defendants' motion for summary judgment as a motion in limine, "the focus of defendants' motion is whether plaintiffs should be allowed to seek the remedy of punitive damages at trial, not whether plaintiffs' claims should fail for lack of evidence") *with Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307 (E.D.N.Y. 2010) (noting that, in *MTBE*, treating motion for summary judgment as motion in limine made sense, as motion presented pure question of law, whereas instant motion argued there was not "sufficient evidence to raise a factual issue for the jury").

the jury and not a basis for summary judgment.  *See Tynan Incinerator Co. v. Int'l Fid. Ins. Co.*, 117 A.D.2d 796, 797 (N.Y. App. Div. 1986) (citing *Losei Realty Corp. v. City of New York*, 171 N.E. 899, 901-02 (N.Y. 1930)).  The motion to limit Egan's lost earnings damages based on his alleged failure to mitigate is denied.

Fourth, Plaintiffs seek to limit Egan's libel damages to nominal damages, arguing that Egan has not established actual damages.  It is well settled, however, that parties suing for libel per se need not plead special damages.  *See Matherson v. Marchello*, 100 A.D.2d 233, 236 (N.Y. App. Div. 1984) (collecting cases).  The authorities that Plaintiffs cite are procedurally inapposite here.  *See Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, 282 F. Supp. 2d 126, 133 (S.D.N.Y. 2003) (evaluating plaintiffs' motion to alter judgment after entry of default judgment against defendants); *Orlowski v. Koroleski*, 234 A.D.2d 436, 437 (N.Y. App. Div. 1996) (limiting slander per se damages to nominal damages, after plaintiff declined to testify and therefore failed to establish actual damages at hearing).  At this stage, limiting Egan's damages is at best premature.  *See Anglo-Iberia Underwriting*, 282 F. Supp. 2d at 132 (quoting *Walrus Mfg. Co. v. Excel Metal Cabinet Co.*, 161 F. Supp. 840, 843 (W.D.N.Y. 1957)) ("In a libel case, more perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages.").  The motion to limit Egan's libel damages to nominal damages is therefore denied.

## VI.   Counterclaims Against Asia Biotech

Plaintiffs move for summary judgment on all of Egan's claims against Counter-Defendant Asia Biotech.  Egan neither opposed summary judgment on those claims, nor identified anything in the record that could provide a basis for a reasonable juror to conclude that any of Egan's damages were caused by Asia Biotech.  Plaintiffs' motion for summary judgment in favor of Asia Biotech is granted, and Asia Biotech is dismissed from this action.

## CONCLUSION

For the foregoing reasons, Egan's motion for summary judgment on the breach of contract claim is GRANTED, and Egan's motions for summary judgment on the libel claims and tortious interference claim is DENIED.  Liu and Plaintiffs' motion for summary judgment on the defamation counterclaim, and Liu and Plaintiffs' motion for summary judgment limiting Egan's counterclaim damages is DENIED IN PART, and GRANTED only to the extent that Egan is not entitled to damages resulting from his allegedly contracting cancer from TA 65.  Liu and Plaintiffs' motion for summary judgment on the counterclaims against Asia Biotech Corp. is GRANTED.  The parties shall appear for a scheduling conference on September 24, 2014, at 11:30 a.m.

SO ORDERED.

Dated: September 18, 2014
      New York, New York

                           LORNA G. SCHOFIELD
                      UNITED STATES DISTRICT JUDGE